IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DIXIE STEEL ERECTORS, INC., a Tennessee corporation, ) ) ) | |
| Plaintiff, ) ) | |
| -vs- ) ) | Case No. CIV-04-390-F |
| GROVE U.S., L.L.C., ) ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER ON
DEFENDANT'S MOTION TO EXCLUDE SURPRISE
OPINIONS OF PLAINTIFF'S EXPERT ROBERT J. BLOCK**

By motion filed on November 4, 2005 (doc. no. 69, herein: Motion), defendant Grove U.S., L.L.C. seeks to exclude what it calls the "surprise opinions" of Dr. Robert J. Block, a metallurgist retained by plaintiff for the purpose of testifying as an expert at the trial of this action. Plaintiff responded to the motion on November 28, 2005 (doc. no. 77, herein: Response), and defendant filed a reply (herein: Reply) on December 22, 2005 (doc. no. 86). The motion is now at issue.

I.   Introduction.

This product liability action arises from an accident which occurred on September 29, 2003, in Ardmore, Oklahoma. Daniel Ramirez, an employee of plaintiff, was injured when he was struck by a truss which was being lowered into

position at the top of a column by a crane which was manufactured by defendant Grove U.S., L.L.C.[1]

Plaintiff seeks to recover the medical expenses it paid on behalf of Mr. Ramirez, as well as additional job-related expenses allegedly incurred as a result of the accident. Plaintiff's theory of liability against Grove is that, as a result of a design defect in the crane, the wire rope from which the truss was suspended became entrapped by a bolt head, which allowed slack to accumulate temporarily in the wire rope. Plaintiff asserts that when the unintended slack was released, the truss dropped, striking Mr. Ramirez in the head and causing his serious injuries.[2] The parties are at issue as to whether the wire rope became entrapped by the bolt head and as to how that occurred, if it did occur.

II.     Summary of defendant's objection.

As will be discussed in more detail in part IV, below, Dr. Robert J. Block, plaintiff's retained expert, submitted his expert report on June 27, 2005. Dr. Block was deposed by defendant in mid-October, 2005. Defendant complains that, in his deposition, Dr. Block disclosed opinions and bases for those opinions (including substantial post-report investigation and analysis) which were not mentioned in his June 27 report. Grove asserts that Dr. Block's new opinions (and his related post-report fact gathering activities) came as a surprise and that plaintiff's attempt, at this stage, to interject new opinions violates the requirements of Rule 26, Fed. R. Civ. P., with respect to disclosure of expert testimony. On this basis, Grove asserts that Dr.

---

[1] Kirby Smith Machinery, Inc., the lessor of the Grove crane, was originally a defendant in this action. Plaintiff's claims against Kirby Smith were dismissed with prejudice by agreement on October 3, 2005.

[2] As concisely summarized by plaintiff: "[T]he attachment of the guide rollers to the boom [of the crane] is done in a defective manner that allows the wire rope to become entrapped by the mounting bolt that holds the roller plate in place thereby creating slack in the rope when scoping in and allowing the [load to] drop when the rope pops free of the bolt head." Response, at iv.

Block's new opinions, and the related results of his post-report activities, should, under Rules 26 and 37 as applied with the guidance of <u>Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.</u>, 170 F.3d 985 (10th Cir. 1999), be excluded.

III.   <u>Procedural history</u>.

This action was filed on March 26, 2004.  On April 22, 2004, the court issued a status and scheduling conference docket notice which directed counsel to familiarize themselves with the chambers procedures of the undersigned judge, as found at <u>http://www.okwd.uscourts.gov/files/jfriotrules.pdf.</u>  Doc. no. 12.  The status and scheduling conference was held as scheduled on June 4, 2004.  At the status and scheduling conference, counsel for plaintiff and Grove confirmed that they had, as directed, familiarized themselves with the chambers procedures and the court answered any questions counsel had with respect to the chambers procedures.  *See* Scheduling Order, doc. no. 24, at ¶ 21(A), p. 3.

Those chambers procedures provide, as pertinent here, that:

<u>Expert reports in civil cases</u>.

> Compliance with the requirements of Rule 26(a)(2) with respect to expert reports is not just another discovery task – it is much more far-reaching than that.  Your Rule 26(a)(2) expert reports are the foundation of your expert case.  Timely and careful compliance with the requirements of Rule 26(a)(2) is essential, both as a matter of fairness to litigants and as a matter of orderly procedure during the series of interdependent scheduled events which occur in the final phases of discovery, motion work and trial preparation.  The combined effect of Rule 26(a)(2), Rule 37(c)(1), Rule 702 of the Federal Rules of Evidence and the Daubert/Kumho line of cases is that a litigant who fails to provide timely and complete Rule 26 expert reports does so at his peril.  Failure to timely comply with the requirements of Rule 26(a)(2) with respect to expert reports could seriously impair your ability to present your case.  The expert reports are at least as important as the experts' depositions in determining the <u>admissibility</u> of your proposed expert testimony at trial (under Rule 702, Daubert and Kumho) and, under

> Rule 37(c)(1), are <u>more</u> important than the experts' depositions in determining the permissible <u>scope</u> of your proposed expert testimony at trial, as is made clear both by the text of Rule 37(c)(1) and by the Advisory Committee's Notes with respect to the 1993 revision of subdivision (c) of Rule 37.
>
> If discovery from opposing parties is necessary as a source of foundation material for your experts' reports, you should start that discovery early, so that any problems may be resolved before they have an impact on your experts' preparation of their reports.

As the original date for submission of plaintiff's expert reports drew near, the parties filed a joint motion requesting the court to revise the scheduling order. Doc. no. 30. That motion was granted by way of an amended scheduling order, doc. no. 31. Under the amended scheduling order, plaintiff's expert reports were due on March 20, 2005. On April 7, 2005, the parties again jointly moved for modification of the scheduling order deadlines. That motion was promptly granted, resulting in a deadline for plaintiff's expert reports of May 1, 2005. Doc. no. 45.

On April 25, 2005, the parties filed a joint motion for extension of time to complete mediation and exchange expert reports, doc. no. 46. That motion was granted, resulting in a June 1, 2005 deadline for plaintiff's expert reports. Doc. no. 47.

Plaintiff failed to submit its expert report by June 1, the fourth extended date for submission of plaintiff's reports. Consequently, on June 16, 2005, citing that failure (among others) to comply with the schedule, Grove filed a motion to exclude witnesses and exhibits (doc. no. 49). That motion requested, among other things, that the court enter an order precluding any expert witnesses for plaintiff from testifying at trial. A hearing was held on that motion on June 28, 2005. Dr. Block's report was submitted on the day before that hearing. Dr. Block's Rule 26 expert report is styled as his "*Preliminary* Report of Findings." (Emphasis added.)  *See,* Exhibit 1 to the

Motion (herein: Report).  Dr. Block's report is described on its cover as having been "Prepared to Conform to the Requirements of Rule 26 of the Federal Rules of Civil Procedure." *Id.*

At the June 28 hearing, the court denied Grove's motion to preclude plaintiff's expert witnesses from testifying at trial, but extended the deadline for Daubert motions to August 1, 2005.  *See* doc. no. 55.  As a result of other extensions, the deadline for Daubert motions was eventually extended to November 4, 2005.  Doc. no. 68.  On that date, Grove filed the present motion (Motion to Exclude Surprise Opinions of Plaintiff's Expert Robert J. Block), as well as a Daubert motion (doc. no. 70) and a motion for summary judgment (doc. no. 71).  Plaintiff has filed responses to the Daubert motion (doc. no. 76, herein: Daubert Response) and to the motion for summary judgment (doc. no. 75, herein: Summary Judgment Response).  As will be seen, the court's consideration of the Daubert motion and the motion for summary judgment will necessarily be affected by the court's disposition of the present motion to exclude surprise opinions.  Accordingly, by this order, the court addresses the motion to exclude surprise opinions.  At a later stage, as set forth in part VI of this order, the court will address the Daubert motion and the motion for summary judgment.

IV.    Dr. Block's activities as a retained expert.

Dr. Block was retained by plaintiff in December, 2004, and had his first meeting with plaintiff's counsel on December 10, 2004.  Tr. at 102.[3]  The fourth deadline for submission of Dr. Block's report was June 1, 2005, nearly seven months after Dr. Block first met with plaintiff's counsel.  The June 1 due date came and went

---

[3] "Tr." citations are to the transcript of Dr. Block's deposition, taken on October 14, 2005. The transcript is attached as exhibit 5 to defendant's Daubert motion (doc. no. 70).

with no report. As has been noted, Dr. Block submitted his report on June 27, 2005, the day before the hearing on Grove's motion to exclude witnesses and exhibits.

Dr. Block's June 27 report does not indicate that, before rendering the report and the opinions stated in the report, he had ever seen either the crane involved in this case or one like it.[4] As will be seen, Dr. Block was unmoved to take that step until much later. Depending on how a reader of the report might differentiate between an opinion and a general observation, Dr. Block's report contains approximately seven conclusions and opinions, four of which are under that heading. Report, at 3 - 5. Dr. Block's June 27 conclusions and opinions may be summarized as follows:

1. It is doubtful that the weather on the day of the accident contributed to the accident. Report, at 3.

2. It is not conceivable that a damaged section of wire rope located in the central region of the drum on the crane could cause the wire rope to become stacked against one of the drum flanges. Report, at 4.

3. Trapping of the wire rope at the roller plate (posited by Dr. Block) is more likely to have caused the drop of the girder than any piling up of the wire rope on the hoist drum. Report, at 5.

4. The condition that led to the trapping of the wire rope beneath the roller bolt head could easily have been avoided, with the present design, by the use of a shield which would have guided the wire rope over those areas of the roller plates that might otherwise trap the wire rope. *Id.*

5. If Grove had performed a failure mode and effects analysis (FMEA), Grove would have recognized, in designing the crane, that the design of the roller plates created a hazard because it was capable of causing a sudden drop of the load. *Id.*

---

[4] Dr. Block's report refers to his examination of "two exemplar Grove cranes," Report, at 2, but it is clear that these were not the model involved in this case. Tr. 70 - 72.

6. The design of the roller plates that enabled the wire rope to become trapped (as posited by Dr. Block) rendered the crane defective and unreasonably dangerous. *Id.*

7. The defect in the design of the roller plates was the direct cause of the accident that resulted in the injuries sustained by Mr. Ramirez. *Id.*

There matters stood as of the date of the hearing on June 28. Although Dr. Block's June 27 report was nearly a month late, it sufficed to save the day at the hearing. The motion to exclude Dr. Block's testimony (among other things, resulting from other violations) was denied. All was apparently well.

Defendant's expert reports were prepared and submitted as required by the scheduling order. The scheduling order contemplated, of course, that plaintiff's expert reports would be submitted before defendant's reports would be prepared and submitted. Because Dr. Block's report was not submitted until after defendant's report was submitted, the court,[5] at the June 28 hearing, granted Grove leave to supplement its expert report not later than July 15, 2005. On that date, Grove's experts did submit a supplement to their previous report.

With defendant's original and supplemental reports in hand, Dr. Block set about doing the work which was, by any reasonable standard, the most meaningful and informative work he has undertaken in this case. On October 5, 2005, nine days before the scheduled date for his deposition, Dr. Block traveled to New Mexico to see, for the first time, the crane involved in this case. Tr. at 34. One purpose of the trip to New Mexico was to "get information about the sizes of things." Tr. at 8. To that end, while in New Mexico, Dr. Block examined the crane and took some pictures. Tr.

---

[5] At the June 28 hearing, counsel for plaintiff represented to the court that Dr. Block was not given a copy of defendant's report before he rendered his report. The court accepts this representation. As will be seen, this fact is immaterial to the court's disposition of the present motion.

7

at 4. Among other measurements, he measured the width of the drum on the hoist. Tr. at 12.

While in New Mexico, Dr. Block also took a video, tr. at 57, and "talked to the crane operator." Tr. at 34.[6]

To do his work, Dr. Block needed specific dimensions, and he got those specific dimensions on the October 5 New Mexico trip. Tr. at 90. With those specific dimensions in hand (as well as the photographs, the video and the operator interview), Dr. Block proceeded to make numerous detailed calculations that are not contained in his June 27 report. Tr. at 7, 13, 16, 19 and 56 and Exhibit F to Motion (exhibits discussed at tr. 8, 9, 19, 24, 25 and 26).

Not surprisingly, Dr. Block's opinions and conclusions grew more specific and detailed as a result of his October 5 New Mexico trip. With the benefit of calculations not to be found in his report (tr. at 7), and with the benefit of his first-time observation of the crane, Dr. Block, when deposed, provided support for his theories with clarity and at a level of detail far beyond the bases set forth in his report. He also articulated his alternative design contention in noticeably greater detail. Tr. at 79-87. The measurements and observations Dr. Block made on his New Mexico trip enabled him to prepare several pages of detailed engineering calculations and sketches, elevating his work to a level of specificity not even hinted at in his June 27 report. *See* Ex. F to Motion.[7]

---

[6] Dr. Block did not have the name of the crane operator. Tr. at 35.

[7] Another matter is noteworthy at this point. Dr. Block opines in his report that if Grove had undertaken a failure mode and effects analysis (FMEA), the design defect he posits would have been apparent. Report, at 5. A FMEA is a systematic engineering analysis undertaken for the purpose of recognizing and evaluating potential failures of a product. *See, generally,* discussion at http://www.ciras.iastate.edu/publications/CIRASNews/fall96/failure.asp (last visited December 28, 2005). Dr. Block's report stops short of indicating that he performed such an analysis, and provides no documentation of any such analysis. However, by affidavit dated November 28, 2005, five months after the date of his report, Dr. Block states that he did, in fact, perform a FMEA. Affidavit

Although he allowed that he could not have made his calculations without the specific dimensions that he measured on his New Mexico trip (tr. at 90), Dr. Block maintained that the fruits of his New Mexico trip are "not essential" to his opinions. Tr. at 90. *See also* tr. at 91 ("useful, but not essential.")[8]

V.   Requirements of Rule 26(a)(2)(B).

Under Rule 26(a)(2)(A), civil litigants are required to disclose the identities of any persons who may be used at trial to present evidence under Rules 702, 703 or 705 of the Federal Rules of Evidence. With respect to retained experts, the disclosure requirement goes much further. Under Rule 26(a)(2)(B), the disclosure of the identity of a testifying expert who has been retained or specially employed to provide expert testimony in the case must be accompanied by a written report prepared and signed by the witness. As to the contents of the report, the rule states that:

> The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other

---

of Dr. Robert J. Block, Ex. G to Daubert Response, at ¶¶ 29, 35 and 36, p. 8. Both plaintiff and Dr. Block now attach considerable significance to his FMEA. Block affidavit, *id.,* Daubert Response, at 16 - 17.

[8] Although defendant calls its motion a Motion to Exclude Surprise Opinions, the motion focuses as much, or more, on the fact that Dr. Block's post-report work yielded a substantial amount of additional data, not used in his June 27 report, that fortifies the opinions expressed in his June 27 report. On the subject of new opinions (not to be confused with new data and analysis purportedly backing Dr. Block's *original* opinions), defendant asserts that Dr. Block's post-report work produced new opinions as to the distance the load could drop if the cable hung up on a bolt, as to whether the crane operator was free from fault and as to whether Mr. Ramirez impermissibly exposed himself to risk by positioning himself under the load. Reply, at 2 - 3. Although these contentions as to new opinions are supported by the papers before the court, there is room for argument that some of the new opinions could, broadly speaking, be encompassed within the opinions stated in the June 27 report. Those matters need not be parsed in this order, because there is no room for doubt that, regardless of the significance of Dr. Block's "new" opinions, Dr. Block's post-report work was highly significant in producing previously undisclosed information, and related analysis, to undergird the opinions stated in his June 27 report. As is discussed in part V, below, the disclosure requirements of Rule 26(a)(2)(B) apply both to opinions and to the basis and reasons for those opinions.

9

>information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Significant in the case at bar is the requirement of Rule 26(a)(2)(C) that the disclosures with respect to experts "shall be made *at the times and in the sequence* directed by the court." (Emphasis added.) It is inherent in the nature of most expert witness endeavors that compliance with the report sequence mandated by the scheduling order is essential. *See, e.g.,* Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1008 (8th Cir. 1998).

The expert witness disclosure requirements in their present form were adopted as part of the 1993 amendments to the Federal Rules of Civil Procedure. The Advisory Committee Notes to the 1993 amendments provide valuable guidance in the application of the expert disclosure requirements. The Advisory Committee Notes make it clear that the report must be "a detailed and complete written report, *stating the testimony* the witness is expected to present during direct examination, together with the reasons therefor." (Emphasis added.) The requirement of completeness is made clear by the following commentary from the Advisory Committee Notes:

>The information disclosed under the former rule in answering interrogatories about the "substance" of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness. Revised Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed.

The Advisory Committee further noted that the report requirement may result in reduction in the length of depositions of experts "and in many cases the report may eliminate the need for a deposition."

Neither Rule 26 nor the court's scheduling regime under LCvR 16.1 (nor the scheduling order commonly entered pursuant to that rule – *see* Appendix III to the Local Court Rules) contemplate that expert disclosure (or, absent truly exceptional circumstances, as discussed below, the accompanying expert work in a particular case) will be an iterative process.  The proponent of the testimony of an expert is obligated to provide a report from that expert complying fully with the requirements of Rule 26(a)(2).  The opposing party is then entitled to rely on that report as a definitive statement of the expert's direct testimony and of the basis for that testimony, even to the extent, as the Advisory Committee Notes indicate, of electing to forego deposing the expert.  As Judge Shadur has put it: "[O]ne valuable byproduct of the 1993 version of Rule 26(a)(2)(B) has been the ability of opposing parties and courts to rely on a claimed expert's report under that Rule as definitive (see the 1993 Committee Note on that subject)." Gentieu v. Tony Stone Images/Chicago, Inc., 214 F.Supp.2d 849, 851 (N.D. Ill. 2002).  The report will provide an essential premise for the opposing party's assessment of what can and should be done, within the deadlines established in the scheduling order, to marshal expert testimony or other evidence to counter the expert's conclusions.  The 1993 Amendments to the Civil Discovery Rules were promulgated with the stimulus of the Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471, *et seq*.  The CJRA's goals of civil litigation expense and delay reduction (*see* 28 U.S.C. § 472) would be substantially undermined if litigants were permitted to treat the expert report requirements casually.  Reports that are preliminary do not suffice. *See* Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 741 n. 6 (7th Cir. 1998), recently cited with approval by our Court of Appeals in Kern River Gas

Transmission Co. v. 6.17 Acres of Land, 2005 WL 3257509 at *5 (10th Cir. Dec. 2, 2005) and Jacobsen v. Deseret Book Co., 287 F.3d 936, 952 (10th Cir.), cert. denied, 125 S.Ct. 40 (2004).  This is because, as Judge Hartz has succinctly stated:  "The orderly conduct of litigation demands that expert opinions reach closure."  Miller v. Pfizer, Inc., 356 F.2d 1326, 1334 (10th Cir. 2004).

In some cases, issues as to Rule 26(a)(2) violations do not arise until trial, *e.g.*, Woodworker's Supply, 170 F.3d at 993.  In other instances, the issue as to Rule 26(a)(2) compliance is raised and addressed before trial, *e.g.* Jacobsen, 287 F.3d at 951-52 ("hearing on this issue" held before trial); Trost, 162 F.3d at 1008 - 09 (untimely expert work disregarded for summary judgment purposes; summary judgment granted and affirmed); Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 60 (1st Cir. 2001) (same).  Whether the issue arises before trial, or at trial, the factors articulated by the Court of Appeals in Woodworker's Supply are to be applied by the district court.  Jacobsen, at 953.  Applying these factors, the district court determines whether the Rule 26(a) violation is "justified or harmless" within the meaning of Rule 37(c)(1).  Woodworker's Supply, at 993.  If the Rule 26(a)(2) violation does not clear the "justified or harmless" hurdle, then the party that failed to comply with the rule "shall not . . . be permitted to use as evidence at a trial, at a hearing, or on a motion any . . . information not so disclosed."  Rule 37(c)(1).  In addition to or in lieu of this remedy, the court may require payment of attorney's fees and expenses and may take any of the actions authorized under Rule 37(b)(2)(A), (B) and (C).

The Woodworker's Supply factors are:

1. The prejudice or surprise to the party against whom the testimony is offered.

2. The ability of the party to cure the prejudice.

3. The extent to which introducing such testimony would disrupt the trial.

4. The moving party's bad faith or willfulness.

Woodworker's Supply, Inc., 170 F.3d at 993.

The court now turns to the application of these Rule 26 and Rule 37 principles to the facts of the case at bar.

VI. Analysis and conclusion.

In its motion, Grove correctly points out that, after he rendered his June 27 report, Dr. Block changed one calculation, traveled to New Mexico to inspect the crane, made several pages of new calculations which directly address key technical issues in the case, spoke with the crane operator, took photographs of the crane and videotaped the crane. Motion, at 7-8. Grove describes the significance of Dr. Block's new calculations as follows:

> These calculations pertained to the amount of drop that could be expected assuming the wire rope were to get caught on a bolt along the roller panel at various sections of the crane. Neither these calculations, nor anything remotely similar thereto, were included in his original report (the only calculation mentioned in his original report related to the amount of drop which would occur if a single loop of wire encircling the drum suddenly fell into its normal position from an abnormal position atop an underlying layer – a phenomenon he says there is no evidence of in this case).

Motion, at 8.

On the basis of the court's reading of the entire transcript of Dr. Block's deposition, the court readily concludes that Grove's contention as to the significance of Dr. Block's post-report calculations (to say nothing of his new post-report opinions) is entirely correct. Dr. Block's additional work hardly amounts to a "fine tuning of data previously disclosed" as asserted by plaintiff (Response, at xii).

In its response, plaintiff also asserts, in substance, that, by way of the deposition testimony of Charles Campbell, president of Dixie Steel, Grove had the gist of Dr. Block's opinions long before Dr. Block's expert report was due (Response, at iv), that Mr. Campbell's opinions are essentially subsumed in Dr. Block's report and in his deposition testimony (*id.,* at vi), that the additional work done by Dr. Block was done in response to "questions posed by defense counsel to other deponents" (*id.,* at vii), and that the change in one calculation which was contained in Dr. Block's June 27 report was minor and essentially irrelevant (*id.,* at ix).

These responses need not detain the court long. The fact that Mr. Campbell may have, in his March, 2005 deposition, articulated opinions substantially similar to those now held by Dr. Block is entirely irrelevant under Rules 26 and 37. The focus here is on the timeliness of Dr. Block's work as a retained expert and, viewing his Rule 26 report in light of his subsequent work, on the timeliness and completeness of his Rule 26 report. To the extent that plaintiff's assertion as to Mr. Campbell's earlier disclosure of *his* theory goes to the issue of prejudice within the meaning of Woodworker's Supply, that will be addressed below.

The assertion that Dr. Block's additional work is not objectionable because it was done "as a result of questions posed by defense counsel to other deponents," Response, at vii, is equally unavailing. *Cf.* Trost, 162 F.3d at 1008. If the proponent of expert testimony desires to have the expert do significant additional work after the opposing party has disclosed its expert case, that matter should promptly be raised with the court. *See, e.g.*, Miller, 356 F.3d at 1332 ("accordingly, on occasion it may be appropriate *to permit* the party using the expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning. A court's failure to permit such supplementation could even constitute an abuse of discretion in some circumstances." [Emphasis added]); Trost, 162 F.3d at

1008 (proponent desiring to do out-of-sequence expert work should file motion). Thus, self-help is not a remedy available to a litigant desirous of sending its expert back to the drawing board or back into the laboratory to do significant additional work after the original report has been rendered.

A brief digression is appropriate here. As the Court of Appeals recognized in Miller v. Pfizer, there will be cases in which post-report activity by an expert will not be as objectionable as Dr. Block's post-report work is in this case. Unanticipated new opportunities to acquire and evaluate new data may arise. Conceivably, opposing expert work may proceed in entirely new directions that could not reasonably have been anticipated, under circumstances which demand an opportunity to undertake responsive work. Neither of these situations obtains in the case at bar. Dr. Block did nothing after June 27 that could not easily have been accomplished in the nearly seven months between the day he was retained and the day that he submitted his report 26 days after the fourth deadline established by the court. Moreover, even if post-June 27 developments had occurred which might have warranted significant new post-report data acquisition and analysis, the completeness requirement of Rule 26(a)(2)(B) and the *sequence* requirement of Rule 26(a)(2)(C) would require, at a minimum, that the litigant ask the court "to permit the party using the expert to submit supplements to the report . . . ." Miller v. Pfizer, 356 F.3d at 1332. Any other approach can be undertaken only at the risk of the proponent – the risk being that the results of the supplemental work, and perhaps in some cases even substantial portions of the original expert work, may be excluded at trial.

Where, as in the case at bar, a significant violation of the Rule 26(a)(2) expert reporting requirement has been clearly established, involving opinions, data, testing or analysis that could have been included in the original report, the court should not, absent extraordinary circumstances, allow the violation to be cured by permitting the

submission of a supplemental report after the violation has occurred. That is especially true in an expert-intensive case like this one. The submission of a supplemental report will often make another full round of expert work unavoidable, thus frustrating one of the fundamental purposes of the 1993 amendments to Rule 26, the Civil Justice Reform Act, and Rule 1, Fed. R. Civ. P. Moreover, a bedrock principle of civil procedure is that litigants who have diligently complied with the rules should not, by virtue of their diligence, be put to a disadvantage at the hands of litigants who have violated the rules. Finally, the court and the public have an interest in the orderly disposition of the business of the court – where one party's violations can be cured only by substantial revamping of the scheduling order on which the opposing parties and the court have relied, the violating party should not ordinarily be afforded a cure opportunity which would make a new schedule a *fait accompli*. The court should not cede control of its docket to litigants who fail to comply with the rules. Trost, 162 F.3d at 1009.

Returning to the Woodworker's Supply factors, as applied to the case at bar, the court concludes as follows:

Prejudice. This is a case in which technical issues beyond the understanding of lay jurors may well be decisive. Expert testimony will likely be pivotal. Rule 26, implemented by the court's scheduling order (and explained, if need be, by the chambers procedures of the undersigned judge which were cited in the status and scheduling conference notice, posted on the court's web site, and discussed at the initial status and scheduling conference in this case) contemplates that each expert will work diligently to amass the factual data necessary for his expert analysis and, having done that, will prepare and submit a timely and comprehensive report complying fully with the requirements of Rule 26(a)(2)(B). With that report in hand, and on the basis of the justifiable assumption that the report as submitted may be relied upon as a

definitive disclosure of the testimony (including opinions and bases therefor) of the expert, the opposing party will be in a position, as discussed in the Advisory Committee Notes (*see* part V, above) to determine whether to "arrange for expert testimony from other witnesses" and to decide whether the report, as rendered, "eliminate[s] the need for a deposition."  In the same vein, bearing in mind that "[t]he orderly conduct of litigation demands that expert opinions reach closure," Miller, 356 F.3d at 1334, the report rendered by the proponent of expert testimony may be regarded by the opposing party as a reliable and definitive statement staking out the four corners of the field on which the expert contest will unfold and providing a statement of the contentions which must either be conceded, deflected or rebutted.  In an expert-intensive case like this one, a Rule 26(a)(2) violation, in which the proponent's expert accomplishes his most significant data acquisition and analysis only after he has rendered his report and the opposing experts have rendered their reports, is inherently prejudicial.  *Cf.* Trost, 162 F.3d at 1008 (reliance by opposing party precluded finding of harmlessness).[9]

Ability to cure.  Dr. Block's June 27 report, which even he labeled as a "preliminary" report, was, in essence, rendered as a mere place holder, submitted with the effect, if not the intent, of putting plaintiff and Dr. Block in a position to await defendant's reports before deciding what they really needed to do to make their case.  That was either a deliberate tactic or the default result of an unacceptably casual attitude toward Rule 26 expert disclosure.  Either way, the prejudice inherent in that approach obviously cannot be cured now.

---

[9] Plaintiff's assertion that the March, 2005 deposition testimony of Mr. Campbell, president of plaintiff, foreshadowed Dr. Block's opinions (Response, at iv) does nothing to mitigate the prejudice arising from the Rule 26 violations as to Dr. Block's work.  Mr. Campbell's deposition testimony would provide cold comfort in cross examining Dr. Block, and nothing in that testimony provided a preview of the work Dr. Block would undertake in New Mexico three months after he submitted his Rule 26 report.

Viewing the issue of prejudice in a different light, it is certainly true, as has been noted, that we could now have an entirely new round of expert work, with new reports, new depositions and new Daubert motions. However, that approach would thoroughly undermine the legitimate expectations of the parties, to say nothing of the policies embedded in Rules 1 and 26(a), Fed. R. Civ. P., all of which is also aside from the impact that approach would have on the court's ability to manage this litigation and the other cases on its docket in a just and orderly manner.

Disruption of the trial. Since plaintiff's Rule 26(a) violation is addressed, in the first instance, before trial (as was the case in Jacobsen), disruption of "the trial," as such, is not a concern here. The disruption of the pretrial process is discussed above.

Bad faith or willfulness. No findings as to subjective bad faith are necessary. Dr. Block has worked as an expert witness for more than 40 years. Affidavit of Dr. Robert J. Block, Ex. G to Daubert Response (doc. no. 76), at ¶¶ 19 and 20, p. 4. He has worked as an expert witness "in federal and state courts in Oklahoma as well as many other jurisdictions in the United States." Id., at ¶ 24. Reported cases involving Dr. Block go back nearly 25 years. Id., at ¶ 25. Between January, 2000 and June, 2005, Dr. Block testified as an expert at trial or by deposition 79 times. See ex. 1 to the Motion. There is no room for doubt that plaintiff's highly experienced attorneys, as well as Dr. Block, knew what Rule 26(a)(2) required. The Rule 26 violations have been clearly established and are substantial. There is no contention, nor could there be, that the Rule 26 compliance issues now before the court arise from some oversight or unavoidable misfortune. Assuming the more benign of the alternatives discussed above under the heading of Ability to Cure, viz., that the violations were the default result of an unacceptably casual attitude toward Rule 26 expert disclosure, they were willful: when a veteran expert, working with experienced counsel, waits until more than three months have passed after the original report was rendered to do the most

18

meaningful work in support of that report, the expert, and counsel, know exactly what they are doing.

The court accordingly concludes that plaintiff's Rule 26 violations are neither justified nor harmless. The court, in its discretion, determines that the appropriate remedy, expressly authorized by Rule 37, is to prohibit the use of any portion of Dr. Block's post-June 27 work in connection with "trial, [or] at a hearing, or on a motion." Rule 37(c)(1), Fed. R. Civ. P. Consequently, the Motion is **GRANTED** as set forth below.

Plaintiff's Daubert Response and its Summary Judgment Response rely, to an extent that is significant at least for present purposes, on Dr. Block's post-June 27 data acquisition and the related analytical work. *See, e.g.*, Daubert Response, at 17, 19, 21; Summary Judgment Response, at 2 - 3 and 6 - 8. Plaintiff's Daubert Response is accordingly **STRICKEN**, except as to the response to Proposition I, addressing Dr. Block's qualifications. Plaintiff's Summary Judgment Response is **STRICKEN**. Plaintiff is **DIRECTED** to file revised responses to defendant's Daubert motion and defendant's motion for summary judgment not later than January 9, 2006. The revised responses shall not make reference to any of Dr. Block's opinions or conclusions, or to the bases and reasons therefor, other than (i) as explicitly stated in his Rule 26 report dated June 27, 2005, or (ii) as necessary to correct errors in his June 27 report (provided that the nature of the error and the need to correct it are thoroughly explained), or (iii) as shown in the transcript of his deposition testimony, in a context clearly indicating that, in giving the cited testimony, Dr. Block is neither giving an opinion not stated in his June 27 report nor relying on any post-June 27 work. If defendant desires to file replies to the revised responses, it shall do so not later than

January 19, 2006.[10]  Defendant's replies, if filed, may refer to Dr. Block's deposition testimony as deemed necessary by defendant to reply to plaintiff's contentions in its revised responses.

After the proceedings with respect to the Daubert motion and the motion for summary judgment have been completed, defendant may file an application for recovery of attorney's fees and expenses, in the form required by LCvR 54.2, setting forth the fees and expenses incurred (i) in connection with the Motion or (ii) in connection with any replies to the revised responses required by this order.

DATED this 29th day of December, 2005.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

04-0390p023(pub).wpd

---

[10] For purposes of addressing the pending motions, it will not be extraordinarily difficult to identify Dr. Block's June 27 work product, as reflected in his report, and that portion of his deposition testimony that is clearly not based on his post-June 27 work. The situation at trial will be more difficult (assuming that this case survives defendant's motion for summary judgment and that Dr. Block's qualifications and his proposed expert testimony survive Daubert/Kumho review). It may be necessary to hold a hearing before trial for the purpose of determining the extent to which Dr. Block can give any testimony free of any influence of his post-June 27 work. The burden of establishing the admissibility of the proposed testimony is on the proponent, Rule 104(a), Fed. R. Evid.; United States v. Cherry, 217 F.3d 811, 815 (10th Cir. 2000); United States v. Metropolitan Enterprises, Inc., 728 F.2d 444, 448 - 49 (10th Cir. 1984).  Doubts will accordingly be resolved against the plaintiff.